**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION**

|  |  |
|---|---|
| CLIFFORD NANCE and KIRK NANCE,<br><br>             Plaintiffs,<br><br>      v.<br><br>KALISPELL SCHOOL DISTRICT #5 and JOHN DOES 1-10,<br><br>             Defendants. | **CV-25-4-M-JTJ**<br><br><br>**ORDER ON MOTION FOR SUMMARY JUDGMENT** |

**INTRODUCTION**

Defendant Kalispell School District #5 ("Kalispell") moves for summary judgment against Plaintiff Clifford Nance ("Clifford") and Kirk Nance ("Kirk") (collectively "Plaintiffs"). (Doc. 38.) Plaintiffs oppose the motion. (Doc. 41.) The Court held a hearing on the motion on April 22, 2026. (Doc. 50.)

**BACKGROUND**

Kirk is the father of Clifford. (Doc. 42 at ¶ 1.) Clifford was a homeschooled student during the 2022-2024 school years. (*Id.* at ¶ 2.) Glacier High School ("GHS") allowed Clifford to participate in the GHS wresting program during the 2023 wrestling season. (*Id.* at ¶ 3.) While on the GHS wrestling team, Clifford began hearing information from other GHS wrestlers that in December 2022 sexual

1

misconduct and hazing of students was occurring within the wrestling program. (*Id.* ¶¶ 35, 37.) Clifford relayed this information to his father, Kirk. (*Id.* At ¶¶ 5, 37.)

At a wrestling meet on January 7, 2023, a student wrestler told Kirk about an alleged sexual assault he endured while on a GHS wrestling trip. (*Id.* at ¶¶ 6, 38.) The student described that other wrestlers had grabbed him on the bus, held him down, and inserted a massager into his anus. (*Id.* at ¶ 6.) Kirk discussed what he had learned from the student with Steven Biggs. (*Id.* at ¶ 8.) Kirk then contacted the student's mother, Leslie Baldwin, to inform her of the sexual assault allegations. (*Id.* at ¶¶ 8, 9.) Kirk had not informed any of the GHS wrestling coaches about what he had learned from the student at this time. (*Id.* at ¶ 7.) Kirk and Baldwin met at the police station to inform authorities about the sexual assault and allegations on January 9, 2023. (*Id.* at ¶ 9.)

On the same day that Kirk and Baldwin made the police report, the Kalispell Police Department ("KPD") notified Kalispell Superintendent Micah Hill ("Superintendent Hill") that it had received a report of an alleged sexual assault that occurred during the state wrestling tournament in 2022. (*Id.* at ¶ 13.) Biggs, Kirk, and Baldwin jointly sent an email to GHS Principal Brad Holloway ("Principal Holloway") on January 9, 2023. (*Id.* at ¶ 12.) The three requested a meeting to discuss the "hazing and sexual assault occurring on the westing bus and in hotels."

(*Id.*) The email was forwarded to Superintendent Hill and GHS Activities Director Mark Dennehy ("AD Dennehy"). (*Id*. at ¶ 48.)

Superintendent Hill informed the Title IX Coordinator, Sara Cole ("Cole"), that he had received notice from KPD that a police report had been filed alleging a sexual assault on a student during the 2022 state wrestling tournament. (*Id.* at ¶ 13.) Superintendent Hill, Principal Holloway, AD Dennehy, Cole, and GHS wrestling coach Ross Dankers ("Dankers") met on January 10, 2023, to discuss the hazing and sexual assault allegations. (*Id.* at ¶ 14.) The meeting agenda discussed Title IX procedures and potential complaints, maintaining student confidentiality, and refraining from questioning the wrestlers about the incident. (*Id.*) Dankers recalled Kirk being mentioned at the January 10, 2025, meeting, but AD Dennehy did not recall reference to Kirk. (*Id.* at ¶ 15.) Cole testified that Clifford was mentioned during the meeting because he had mentioned the hazing, sexual assault, and police report to another student and recommended that the other student speak with their parents. (*Id.* at ¶ 50.)

Kirk had another conversation with the student alleging the sexual assault at a wrestling dual on January 10, 2023. (*Id.* at ¶ 16.) AD Dennehy witnessed the conversation and requested that Kirk leave the student. (*Id.*) Kirk subsequently attended the wrestling practice on January 11, 2023. (*Id.* at ¶ 17.) Dankers and AD

Dennehy asked Kirk to leave and told Kirk he was not allowed at wrestling practices. (*Id.*)

Kirk had a tense interaction with AD Dennehy at GHS the following day on January 12, 2023. (*Id.* at ¶ 18.) It remains disputed whether Kirk showed up to wrestling practice or was waiting for Clifford to finish practice. (*Id.*) Kirk contends that he requested retaliation paperwork from AD Dennehy during this conversation. (*Id.*) AD Dennehy allegedly informed Kirk he would need to go to the Kalispell school district office to obtain the proper paperwork to file a retaliation claim. (*Id.*) AD Dennehy sent an email to Superintendent Hill, Cole, and Principal Holloway on January 13, 2023, documenting the concerns he had about Kirk following the interaction. (*Id.* at ¶ 19.)

Kirk arrived in Missoula at the hotel the GHS wrestling team was staying at for Clifford's wrestling meet on January 13, 2023. (*Id.* at ¶¶ 20, 21.) Kirk interacted with Dankers, Assistant Coach Garrett Melton, and a varsity wrestler at the hotel. (*Id.* ¶¶ 21.) The Missoula Police Department ("MPD") dispatched an officer to the hotel over reports that Kirk was "harassing" Dankers and the wrestlers. (*Id.*) Dankers noted that Kirk was "screaming" at him and being "loud and erratic." (*Id.* at ¶ 24.) MPD Officers questioned the parties involved in the interaction and cited Kirk with

disorderly conduct. (*Id.* at ¶ 25.) Kirk argues that his disorderly conduct citation arose from false statements made to MPD Officers. (*Id.*)

The following day on January 14, 2023, Kirk sent AD Dennehy and Dankers a text that read, "I can tell you guys are scared and you should be." (*Id.*) AD Dennehy notified Kirk on January 14, 2023, that he was "trespassed" and could not return to Kalispell school property. (*Id.* at ¶ 27.) Clifford alleges that Dankers and Melton stopped providing him with coaching and instruction at wrestling practice and attempted to intimidate him following the trip to Missoula. (*Id.* at ¶ 66.)

Kalispell contends that AD Dennehy did not know of Kirk's involvement in the reporting of the allegations of sexual assault to the KPD when he texted Kirk that he was "trespassed" from Kalispell school district property. (*Id.* at ¶ 28.) Kirk submitted a retaliation complaint to the U.S. Department of Education Office for Civil Rights ("OCR") on January 30, 2023. (*Id.* at ¶ 29.)

10 months following the above incidents, Clifford sought a waiver from the Montana High School Association ("MHSA") in October 2023 to transfer to a different school to compete in their athletics. (*Id.* at ¶ 32.) MHSA initially denied Clifford's request but later granted Clifford the waiver. (*Id.* ¶ 33.) Plaintiffs argue that Clifford's request was initially blocked due to AD Dennehy's actions in responding unfavorably to the petition for waiver. (*Id.*) AD Dennehy responded to Clifford's transfer petition that Clifford had no hardship and did not need to transfer

but cited that Kirk did not get along with the wrestling staff. (*Id.*) Following MHSA approval after the initial denial, Clifford transferred and competed for Flathead High School through the 2023-2024 wrestling season. (*Id.* at ¶ 34.)

Plaintiffs filed a complaint against Kalispell on January 1, 2025. (Doc. 1.) Plaintiffs filed an amended complaint on February 24, 2025. (Doc. 9.) Plaintiffs allege Title IX Retaliation claims against Kalispell. (*Id.* at 17-20.)

## LEGAL STANDARD

A court may grant summary judgment when the movant demonstrates that there exists "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute of material fact requires sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.* at 248. When viewing the record in deciding a summary judgment motion, a court must view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in the nonmovants favor. *Tabares v. Huntington Beach,* 988 F.3d 1119, 1124 (9th Cir. 2021) (citations omitted).

## DISCUSSION

Kalispell argues that, as a matter of law, it did not retaliate against Plaintiffs and that it was acting in the best interests of all students following the allegations

that may give rise to Title IX complaints. (Doc. 39, 48.) Kalispell also contends that Plaintiffs cannot make out a prima facie case of retaliation. (Doc. 39.) Kalispell makes the following arguments: (1) Plaintiffs did not engage in a protected activity; (2) Kalispell's exclusion of Kirk from the GHS wrestling practice and school property was not an adverse action; (3) Clifford did not experience an adverse action; and (4) no causal connection exists between the protected activities and adverse actions. (*Id.*) The Court will address each issue in turn.

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). There is an implied right of action for retaliation against a person who has complained of sex discrimination. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005). A retaliation claim under Title IX may be demonstrated through direct or indirect evidence. *Pickard v. City of Tuscan*, 2019 U.S. Dist. LEXIS 39489, at *18 (D. Ariz. 2019).

## I.     Direct evidence of retaliation by Kalispell

Direct evidence requires that a plaintiff provides "evidence which, if believed, proves the fact [of discriminatory animus] without inference or presumption." *Godwin v. Hunt Wesson, Inc*. 150 F.3d 1217, 1221 (9th Cir. 1998).

7

Plaintiffs argue that they have direct evidence that Melton retaliated against Plaintiffs. (Doc. 41 at 20; Doc. 42 at ¶ 79.) Plaintiffs cite to an email by Kalispell's Title IX coordinator, Cole, who wrote that Melton's behavior following the sexual assault reports "could have been perceived as retaliatory" and suggested that Melton no longer serve as the assistant wrestling coach. (Doc. 41 at 20-21.) Plaintiffs contend that based off of this email a reasonable jury could find retaliation to defeat summary judgment. (*Id*. at 21-22.)

Kalispell disputes that Cole's email establishes direct evidence of retaliation because the email was sent after Kirk had limited access to Kalispell property and her email does not reference Plaintiffs. (Doc. 48 at 8.) Kalispell further contends that Cole testified in her deposition that she could not point to direct evidence of retaliation by Melton or that Melton's behavior prompted her to investigate his conduct. (*Id*.)

The Court finds that Cole's email describing Melton's behavior as retaliatory supports Plaintiffs' claims of retaliation against Kalispell. Plaintiffs may rely on Cole's email and Melton's conduct following Kirk's reports at trial to support their retaliation claims. Defendants dispute that Cole's email provides support for Plaintiffs' retaliation claims as the email does not acknowledge Melton may have been retaliating specifically against Plaintiffs and was sent after Kirk alleges the retaliation began. The parties remain free at trial to argue the importance, relevance,

or weight the jury should give Cole's email regarding Melton's alleged retaliatory conduct.

## II.   Indirect evidence of retaliation by Kalispell

"[A] plaintiff who lacks direct evidence of retaliation must first make out a prima facie case of retaliation by showing (a) that he or she was engaged in protected activity, (b) that he or she suffered an adverse action, and (c) that there was a causal link between the two." *Emeldi v. Univ. of Or.*, 698 F.3d 715, 724 (9th Cir. 2012) (internal citations omitted). The requisite degree of proof necessary to establish a prima facie Title IX retaliation case on summary judgment is minimal and the proof "does not even need to rise to the level of a preponderance of the evidence." *Emeldi*, 698 F.3d at 724 (citations omitted).

### a.   Protected Activity

"Protected activity" means "protesting or otherwise opposing unlawful activity." *Emeldi*, 673 F.3d at 1225. "[S]peaking out against sex discrimination" is a protected activity. *Id.* (quoting *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. at 178). A protected activity does not remain limited to the filing of a formal internal complaint, and courts have recognized that reporting sexual misconduct to outside authorities also qualifies as a protected activity under Titel IX. *See Ollier v. Sweetwater Union High School District*, 768 F.3d 843, 868 (9th Cir. 2014) (holding that a protected activity occurred when a parent expressed gender inequality

9

concerns within the female athletic program to a school official); *Strzykalski v. Bd. of Educ.*, No. 23 CV 1284, 2025 U.S. Dist. LEXIS 120557, at *11 (N.D. Ill. June 25, 2025) (confirmed a report to outside authorities may constitute a protected activity under Title IX and counts as a "step in opposition to a form of discrimination that the statute prohibits.") (citations omitted).

### i.    Whether Kirk engaged in protected activities

Kirk's reporting of the sexual assault to KPD and sending an email to GHS school officials to complain and discuss the sexual misconduct and hazing allegations constitute protected activities. Kalispell acknowledges that Kirk was "speaking out against discrimination" and became an outspoken figure regarding the hazing and sexual assault allegations. (Doc. 39 at 13.) Kalispell contends, however, that Kalispell did not know of Kirk's involvement or alleged protected activities before any alleged adverse actions occurred. (*Id*.) The Court disagrees.

Kalispell disputes whether Kirk actively participated in the report to KPD or that Kirk informed KPD of allegations that GHS had a pattern or practice of sexual harassment at GHS. (Doc. 39 at 16.) Plaintiffs provide ample evidence that Kirk described in detail the allegations of sexual assault he was told by the student and Clifford to KPD. (Doc. 41 at 22.) Kirk informed KPD that Clifford had indicated that a pattern of inappropriate behavior was happening during GHS wrestling trips on the bus and hotel rooms beyond the one complaint by the student. (*Id*.) The KPD

10

officer taking the complaint from Kirk and Baldwin further informed Kirk that they would be passing along the information they had received to Kalispell. Kirk's complaints to KPD and the passing along of the information to Kalispell establishes that Kirk was engaged in "protesting or otherwise opposing unlawful activity." *Emeldi*, 673 F.3d at 1225. These facts of reporting presented by Plaintiffs establishes that Kirk did protest and oppose unlawful behavior when he informed KPD of the allegations and played an active role in reporting the sexual assault with Baldwin.

Additionally, Kirk personally informed Kalispell school officials about his Title IX concerns and oppositions. Biggs sent an email to Principal Holloway that was sent on behalf of himself, Kirk, and Baldwin that provides evidence that Kirk directly opposed and complained of unlawful activity of sexual harassment to GHS school officials and not just to outside authorities. Biggs's email sent on January 9, 2023, requested that a meeting be held to discuss the hazing and sexual assault allegations and noted that a police report had been filed. (Doc. 42 at ¶¶ 12, 48.) Bigg's email, containing Kirk's signature, also constitutes a protected activity as Kirk directly complained to GHS school officials about sex discrimination occurring on the GHS wrestling team. Kirk, therefore, directly informed the "appropriate person" that could address the alleged unlawful misconduct occurring on the GHS wrestling team. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998).

Kirk contends that Biggs's email also was circulated to AD Dennehy and Superintendent Hill to put them on notice of Kirk's involvement and complaints. (Doc. 42 at ¶ 48.) Disputed facts remain on whether Kirk's name was mentioned at the meeting held January 10, 2023, to discuss Title IX procedures with Superintendent Hill, Principal Holloway, Cole, and Dankers. (Doc. 42 at ¶ 15.) Dankers testified that Kirk was mentioned, but AD Dennehy denied that Kirk had been brought up. Regardless, Plaintiffs have provided sufficient evidence that AD Dennehy and other GHS school officials knew of Kirk's protected activities, including complaining about sex-based misconduct occurring during school-sponsored events, by January 10, 2023. Kirk also provides sufficient evidence that he informed Principal Holloway and AD Dennehy about his concerns relating to the hazing and sexual assault allegations, and his concerns relating to Clifford's safety on the GHS wrestling team in person by January 12, 2023. (Doc. 42 at ¶¶ 54-55.)

Therefore, contrary to Kalispell's contentions that Kalispell staff did not know of Kirk's actions, Kalispell, when the evidence is viewed in the light most favorable to Kirk and Clifford, was well aware of Kirk's involvement in opposing and protesting against the sexual harassment on the GHS wrestling team. These protected activities by Kirk occurred before the alleged adverse actions by Kalispell began and before Kalispell limited Kirk's access to the school property on January 14, 2023. Title IX undoubtably empowers a parent or student to complain and speak out to

either school officials or police authorities about allegations of sexual misconduct occurring within the GHS wrestling program without fear of retaliation. *Jackson, 544 U.S. at 178*. Kirk has made a sufficient showing that he engaged in protected activities under Title IX.

### ii. Whether Clifford engaged in protected activities

Kalispell argues that Clifford did not engage in any conduct that qualifies as protected activity. (Doc. 39 at 17.) Kalispell claims that Clifford only asked questions of his peers but did not disclose any information about the sexual misconduct allegations to GHS staff, coaches, law enforcement, or a governmental agency. (*Id.*) Plaintiffs counter that Clifford did engage in a protected activity when he disclosed to another student that police were involved in sexual assault allegations and that the student should inform their parents. (Doc. 41 at 25.) Plaintiffs contend that even if Clifford cannot show he personally engaged in a protected activity that the Ninth Circuit allows Clifford to sue based on falling within the "zone of interests." (*Id.* (citing *Thompson v. North American Stainless, LP,* 562 U.S. 170, 177-78 (2011); *Ollier*, 768 F.3d at 866).) The Court agrees.

In *Ollier*, students had filed a class action complaint against the school claiming sex discrimination under Title IX based on unfair discriminatory conduct the female athletes endured at the school. 768 F.3d at 851. The named students' father had complained to the school about "inequalities for girls in the school's

athletic programs." *Id*. at 853. Shortly after this complaint, the students' softball coach was fired, which the students alleged constituted as retaliatory conduct. *Id*. The Ninth Circuit affirmed that the students had standing to bring their Title IX retaliation claims based on the assertion that the students experienced injury flowing from the school "impermissibly retaliat[ing] against [the students] by firing Coach Martinez in response to Title IX complaints [] made on [the students'] behalf." *Id*. at 865.

*Ollier* reasoned that an injured party may sue under Title IX if they "fall[] within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis of his complaint." 768 F.3d at 866 (citing *Thompson*, 562 U.S. 170.)) *Ollier* rejected the school's argument that the students' claims could not proceed solely because the students did not engage in the protected activity, and the students were not subject to the unlawful retaliation underlying the Title IX complaint. *Id*. *Ollier* reasoned that "any plaintiff with an interest arguably sought to be protected by" a statute may sue. *Id*. And that "[s]tudents have 'an interest arguably sought to be protected by' Title IX—indeed, students are the statute's very focus." *Id*. *Ollier* allowed the students' claims to proceed reasoning that the student had faced injuries flowing from the school's retaliatory responses to Title IX complaints made by the students' parents and coach. *Id*. at 866-67.

14

The same is true here as Clifford falls within the "zone of interests" that Kirk's Title IX complaints arguably sought to protect. Clifford asserts Title IX retaliation claims against Kalispell on the basis that Kalispell impermissibly retaliated against Clifford by limiting the coaching and instruction he received and petitioning to deny his MHSA transfer waiver in response to Title IX complaints Kirk made. Therefore, although Clifford may not have engaged in a protected activity or was not the subject of the unlawful retaliation, Clifford has standing to bring an independent Title IX retaliation claim against Kalispell.

Kalispell removed Kirk from the school premises after complaining and speaking out about the alleged sexual harassment occurring at school sponsored GHS wrestling trips in the buses and hotel rooms. Kirk's protected activities and Title IX complaints arguably sought to protect Clifford, as Clifford was a wrestler on the GHS wrestling team where the alleged sexual misconduct was taking place. Following Kirk's complaints and removal from Kalispell property, Clifford alleged that he experienced injuries such as receiving intimidation from Melton and not having the adequate coaching from Dankers and Melton at wrestling practice. Kirk no longer could observe the wrestling practices to ensure Clifford received the proper instruction.

Finally, Clifford's MHSA transfer request was denied originally because AD Dennehy informed MHSA that Clifford's father had problems with the GHS

coaching staff, but that Clifford otherwise did not experience hardship necessary to effectuate the transfer. The alleged instances of retaliation on Clifford directly flow from Kalispell's alleged retaliatory responses to Title IX complaints made by his father, Kirk. Plaintiffs have provided sufficient evidence to establish that Clifford suffered judicially cognizable injuries flowing from Kalispell's retaliatory conduct following Kirk's Title IX complaints made on behalf of Clifford. Clifford has a viable retaliation claim against Kalispell under the "zone of interests" theory.

### b. Adverse Action

A material adverse action is one that a reasonable person would have found the to "have dissuaded a reasonable person from making or supporting a charge of discrimination." *Ollier*, 768 F.3d at 868. Kalispell argues that Plaintiffs have failed to establish they experienced an adverse action by Kalispell. (Doc. 39 at 18.) Kalispell contends that because parents do not have a right to unfettered access to school property that Kirk's exclusion from school property cannot be considered an adverse action. (Id.) The Court disagrees.

Questions of disputed material facts remain as to whether Kalispell's exclusion of Kirk from school property constitute as an adverse action. A reasonable person, originally allowed to attend wrestling practice, and then excluded from attending the wrestling practices, could be dissuaded from complaining of sexual harassment to defeat summary judgment. Similarly, a reasonable person could find

that the conduct Clifford experienced following Kirk's complaints such as alleged diminished coaching and the blocking of his MHSA transfer could be seen as adverse actions. The jury remains the proper factfinder to determine these disputed questions of fact.

### c. Causal link

The Ninth Circuit has "construed the causal link element 'broadly' such that a Title IX retaliation plaintiff *at the prima facie stage* "merely has to prove that the protected activity and the adverse action are *not completely unrelated*." *Rasheed v. Mt. San Antonio Coll.*, No. 23-55129, 2023 U.S. App. LEXIS 32735, at *2 (9th Cir. Dec. 12, 2023) (emphasis added) (quoting *Grabowski*, 69 F.4th at 1122). Causation may be inferred from the "proximity in time between the protected action and the allegedly retaliatory [action]." *Cornwell v. Electra Cent. Credit Union*, 439 F. 3d at 1018, 1035 (9th Cir. 2006).

The proximity in time between Krik's complaint to KPD and Kalispell school officials about the sexual assault and hazing allegedly occurring on the GHS wrestling team provides ample circumstantial evidence of causation. Kirk reported the sexual harassment and misconduct to KPD on January 9, 2023. By January 12, 2023, Kirk was told he could no longer attend Clifford's wrestling practices and by January 14, 2023, Kirk was trespassed from Kalispell school property. These alleged adverse actions by Kalispell occurred very close in time after Kirk became involved

17

in speaking out against the hazing and sexual misconduct allegations involving the GHS wrestling team. Plaintiffs have sufficiently shown that the protected activities and adverse actions were not completely unrelated. *Rasheed,* 2023 U.S. App. LEXIS 32735, at *2. The Court determines that Plaintiffs have met the minimal bar necessary to make out a prima facie case of retaliation at the summary judgment stage.

### III.    Burden shifting to Defendant

If a plaintiff makes a prima facie case of retaliation, the burden shifts to the defendant to "articulate a legitimate, nonretaliatory reason for the challenged action." *Emeldi*, 698 F.3d at 724. Then, "[i]f [Kalispell] sets forth such a [permissible] reason, [Plaintiffs] bear the ultimate burden of submitting evidence showing that [Kalispell's] proffered reason is merely a pretext for a retaliatory motive." *Id.* A plaintiff may show the reason proffered by the defendant is "pretextual either directly by persuading the court that a discriminatory reason more likely motivated [Kalispell] or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id*.

Kalispell argues that it did not retaliate against Plaintiffs, but rather, that it took the necessary steps of protecting the students and school staff during the Title IX investigation by excluding Kirk from school premises. (Doc. 39 at 21-22.) Kalispell contends that Kirk's erratic behavior, including the incident in Missoula,

18

forced Kalispell to take protective actions for the safety of the students and coaches. (*Id.* at 22.) Therefore, Kalispell's nonretaliatory reason for excluding Kirk was justified due to Kirk's behavior and Kalispell's safety concerns. (*Id.*)

Conversely, Plaintiffs argue that Kalispell's proffered reason is pretextual given the proximity in time to Kirk's complaints and the school officials' motives. (Doc. 41 at 31-33.) Kirk disputes Kalispell's version of events regarding his behavior and conduct surrounding the Title IX investigation. (*Id.*)

Plaintiffs have presented evidence from which a reasonable jury could conclude that Kalispell's proffered explanation is pretextual when viewing the evidence in a light most favorable of the nonmovant. A genuine dispute of material fact exists on whether Kalispell had justified reasons for its actions against Kirk and Clifford or if Kalispell's purported reasons are merely pretext. The trier of fact remains the proper party to address these factual questions, rather than a decision on summary judgment.

## CONCLUSION

Plaintiffs have met the minimal bar needed to defeat summary judgment and make out a prima facie case of retaliation. A reasonable juror could conclude that both Kirk and Clifford (1) participated in a protected activity; (2) experienced materially adverse actions; and (3) established a causal connection between the protected activities and adverse actions. Materially disputed facts remain on whether

Kalispell's alleged adverse actions were necessary given Kirk's behavior or were merely pretext. The Court denies Kalispell's motion for summary judgment.

## ORDER

Accordingly, **IT IS HEREBY ORDERED** that Kalispell School District #5's Motion for Summary Judgment (Doc. 38) is DENIED.

DATED this 28th day of April 2026.

John Johnston
United States Magistrate Judge